UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION
-----------------------------------------------------------------X
ELIZABETH SINES, ET AL.,

Plaintiffs,
v.

JASON KESSLER, ET AL.,

    Defendants.

Original Western District of VA
Case No. 3:17-cv-00072-NKM

-----------------------------------------------------------------X

State of New York    }
                              }ss.
County of Orange    )

Michael Peinovich, being duly sworn, deposes and states the following:

1. I am the non-party served with the Subpeonae at issue herein. *Exhibit 1 Subpoenae dated May 22, 2020 and May 29, 2020.* Please note that one of the Subpeonae is "Duces Tecum," seeking the production of documents under 12 numbered categories, and one of the Subpoenae is "ad Testificandum," seeking testimony. Upon information and belief, both were apparently served on the same time and service does not appear to have been complete until June 1, 2020, when they were apparently mailed to me after being taped to my door at some earlier period. Confusingly, the two subpoena were delivered as one package.

2. I am a resident of Dutchess County, New York.

3. I ask this Court to quash the Subpoenae served on me for a variety of reason, as set forth in my attorney's accompanying Memorandum of Law. Most importantly, the Subpoenae are meant to harass and burden a non-party. They reek of bad faith, the particulars of which are found below. For this I am also requesting sanctions against both Plaintiff

Wispelwey and his counsel, Cooley, LLP.

4. The Subpoenae are allegedly served for the purposes of seeking evidence related to the Second Amended Complaint filed September 17, 2019. *Exhibit 2.* As the Court can see, the main action is a lawsuit arising out of the aborted Unite the Right Rally in Charlottesville Virginia on August 12, 2017.

5. I had formerly been a defendant in this lawsuit, but was dismissed from the case by order of Judge Moon dated July 9, 2018 because there were not even colorable allegations against me. *Exhibit 3, Order of Dismissal dated July 9, 2018, at pp. 39–41 62.*

6. While still a party to this case, I served responses to Plaintiff Wispelwey's demands on or about June 11, 2018. *Exhibit 4.* I made clear that it was not possible to turn over materials that Plaintiffs were seeking, for the most part because I had been "deplatformed." However, I did turn over what I had that was responsive. *Exhibit 4 at pp. 4-6.* (Furthermore, although I was supposed to speak at said Unite the Right Rally, I took no part in the planning of the rally.)

7. I had also served Interrogatory Demands on Plaintiff Wispelwey. His sworn answers, dated May 14, 2018, demonstrate his extreme bad faith, as well as that of his attorneys, Cooley, LLP. *Exhibit 5 Wispelwey Interrogatory Responses dated May 14, 2018.*

8. To understand why, it is necessary to take account of the Independent Report of Hunton & Williams by Attorney Timothy J. Heaphy dated November 24, 2017 (hereafter, the "Heaphy Report"), a copy of which is attached hereto as *Exhibit 6.*

9. The popular image of the Unite the Right Rally, whereby a bunch of evil racists came to Charlottesville with the intention of committing violence against people of color (as opposed to potentially defending themselves from leftist violence), is, from my

       perspective, a complete fabrication. In this regard, I highly recommend the Heaphy Report.

10.    Plaintiff Wispelwey appears several times throughout the Heaphy Report. In fact, his Interrogatory Responses confirm that he contributed information to the Heaphy Report. *Exhibit 5 at p. 7.*

11.    For example, Plaintiff Wispelwey formed a group in Charlottesville know as "Congregate Charlottesville" which had the specific goal of engaging in lawless behavior that would deny the First Amendment Rights of the UTR attendees:

> "Individuals who attended [trainings organized by Plaintiff Wispelwey] told us that their goal was to create 'cognitive dissonance' and to delay and obstruct the hate speech that they expected. *They wanted to be visible in the opposition to the right-wing groups and make it harder for them to have a platform to express racism. In service of that mission, they were willing to break the law.*" *Exhibit 6, Heaphy Report, numbered pp. 72-73.*[1] (emphasis supplied)

12.    Furthermore, both the FBI and the progressive Anti-Defamation League warned the Charlottesville Police Department that while the UTR rally organizers would be peaceful, probable violence could be expected from the counter-protestors and Antifa who would oppose the UTR attendees. *Exhibit 6, Heaphy Report, numbered p. 70.*

13.    Indeed, Boies Schiller Flexner, LLP, co-counsel for plaintiffs in this case, apparently provided legal advice to the City of Charlottesville on August 2, 2017 (prior to the antifa riot ten days later), which led the City to conclude that it had no credible threat of violence from the UTR organizers, although there was "information that counter-protesters planned to use violence to quell a permit holder's speech." *Exhibit 6,*

---

[1] I make this point and those below with citations to the Heaphy Report based on information and belief from the materials in the Heaphy Report, but will not keep adding the refrain "upon information and belief" because it would be cumbersome.

*Heaphy Report, numbered p. 82.*

14. Several Officers within the CPD reached out to Pikesville, KY, where a prior Alt-Right event had occurred: "Those contacts suggested that the Alt-Right groups were generally cooperative with law enforcement, but also that the opposing groups needed to be physically separated." *Exhibit 6, Heaphy Report, numbered p. 87.*

15. The UTR organizers cooperated with the law enforcement, notifying the police of their plans in general and even of the torchlight rally on August 11, 2017, for which they expected police presence and protection. *Exhibit 6, Heaphy Report, numbered pp. 70, 71-72, 96, 97, 113.* In contrast, attempts by the Charlottesville Police Department to cooperate with the counter-protesters "were met with extreme resistance" and even the threat of legal action. *Exhibit 6, Heaphy Report, numbered p. 71.*

16. The Charlottesville Police themselves came to agree with the assessment of the FBI, the ADL, the Pikesville, Kentucky police, and co-counsel Boies Schiller Flexner, LLP, which was that the true threat of violence came from the "militant anti-fascist groups" *Exhibit 6, Heaphey Report, numbered p. 70.* They worried that "as soon as counter-protesters learned the whereabouts of [the UTR Rally speakers], their location would become 'a hot area.'" *Exhibit 6, Heaphy Report, numbered p. 97.* Furthermore, "In the week before August 12, the Virginia Fusion Center shared credible threats that members of Antifa would bring soda cans filled with cement and might attack police. Then, on the morning of August 12, rumors circulated among CPD that Antifa might attack officers with fentanyl." *Exhibit 6, Heaphy Report, numbered p. 98.*

17. Unfortunately for all concerned, the plan conceived at the highest level of the Charlottesville Police Department was "to declare the event unlawful and disperse the

crowd." *Exhibit 6, Heaphy Report, numbered p. 98.* To this end, Charlottesville Police Chief Thomas apparently hoped for violence so that he could give in to a "heckler's veto."

18. Indeed, on the morning of the UTR rally, in the face of reports of growing violence on Market Street, he apparently remarked: "let them fight, it will make it easier to declare an unlawful assembly." *Exhibit 6, Heaphy Report, numbered p. 133.*

19. On the morning of UTR, the Antifa were asked to leave a more peaceful progressive group at Charlottesvile's First United Methodist Church when they refused to foreswear violence. *Exhibit 6, Heaphy Report, numbered p. 123.*

20. Plaintiff Wispelwey, allied with the Antifa and other counter-protesters, helped create violence at the UTR with his blockade of the entrance to the southeast corner of the park (where UTR attendees had been instructed to enter – they were later re-routed, which created additional confusion): " Wispelwey told us that they intended to block entry for the Unite The Right demonstrators. He said there were no police present at the intersection, but the clergy hoped they might 'create a scene' that would lead to a police response." *Exhibit 6, Heaphy Report, numbered p. 129.* It was at this approximate juncture where the violence erupted when counter-protesters attempted to block the League of the South and the Traditional Workers Party from entering the park. *Exhibit 6, Heaphy Report, numbered p. 130.*

21. Consistent with Charlottesville Police Chief Thomas' hope that fighting would "make it easier to declare an unlawful assembly" (*Exhibit 6, numbered p. 133*), law enforcement refused to intervene to quell any fighting. *Exhibit 6, Heaphy Report, numbered pp. 130-132.* There is in fact only one reported instance where the Charlottesville Police

intervened to quell violence between the UTR attendees and the counter protestors and Antifa (which sole instance occurred when one Lt. Hatter intervened to prevent a counter-protestor from taking a flag from a UTR attendee). *Exhibit 6, Heaphy Report, numbered p. 128.*

22. The fighting just in front of Plaintiff Wispelwey, on Market Street and 2nd Street, eventually grew so intense that Captain Thomas secured his declaration of an unlawful assembly. *Exhibit 6, Heaphy Report, numbered p. 133.*

23. Having fomented the conditions which provided an excuse to prevent the UTR rally, law enforcement then cleared the park by pushing the UTR attendees straight into the waiting arms of the counter-protestors and Antifa who had caused the violence:

    "Much like the plan for entry to Emancipation Park, the dispersal of crowds following the unlawful-assembly declaration did not ensure separation between conflicting groups. Rather, the mobile field force units pushed the Unite The Right protesters right back onto Market Street, where a larger group of counter-protesters were waiting for them... Lieutenant Hatter described the dispersal of Emancipation Park on August 12 as the 'most messed up thing I ever saw.' Hatter noted that the Alt-Right demonstrators were screaming at the VSP and CPD officers as the mobile field force pushed from the rear of Emancipation Park, commenting that 'you are pushing us right into the crowd.' Hatter agreed with this assessment, noting that the effort was 'causing confrontations and pushing [the Alt-Right] right into their enemies.' Lieutenant Mooney similarly told us that several of the Alt-Right demonstrators complained to him that the dispersal order 'is pushing us right into our enemies.'" *Exhibit 6, Heaphy Report, numbered p. 135.*

24. Based upon the above, it should be clear that:

    a. Plaintiff Wispelwey, intentionally engaged in illicit behavior on the day in question, with the intention of denying First Amendment rights to those with whom he disagreed;

    b. Plaintiff Wispelwey was closely allied with and supportive of violent activists on

   the day in question;

 c. The police knew that the true threat of violence would come from Antifa and other "progressive" organizations on the day in question, a surmise confirmed by other law enforcement, as well as the Anti-Defamation League and co-counsel Boies Schiller Flexner, LLP on August 2, 2017;

 d. The violence was indeed precipitated by such "progressive forces," who attempted to deny the UTR rally attendees access to the park on to the day in question;

 e. Plaintiff Wispelwey, observed the violence fomented by the Antifa and counter-protestors from his perch on the southeast steps of the park;

 f. Plaintiff Wispelwey, would also have been perfectly situated, from his southeast corner steps, to see the police push the unwilling UTR attendees into the maw of the waiting Antifa crowd when the park was cleared; and

 g. Plaintiff Wispelwey has now launched and maintained a frivolous lawsuit against those whose civil rights he sought to squelch on August 12, 2017.

25. Moreover, as stated above, by Objection dated May 14, 2018, Plaintiff Wispelwey took the position – which has now been successfully maintained throughout this lawsuit and which I submit is therefore grounds for estoppel – that the identity of the persons who had knowledge of those perpetrating violence on the day in question was "not relevant to any party's claims or defenses." *Exhibit 5, at Objection to No. 12, pp 16–18.*

26. In taking this position, it appears that Plaintiff Wispelwey was seeking to protect either himself or another of his colleagues from "Congregate Charlottesville" who celebrated the violence of the Antifa in the following words:

  "A note on the Antifa:

"They are the reason Richard Spencer did not speak today. They are the reason the 'Unite the Right' march didn't happen. They strategically used violent tactics to incite the Nazis to violence, such that the governor declared a state of emergency before noon. Before the 'Unite the Right' rally was scheduled to begin.

"One could argue this meant Nazis dissipated into the streets faster making it less safe, but let's be real: Nazis have been making these streets less safe for a long time. They would have been out and about soon enough with or without the antifa.

"I was with a group of clergy committed to non-violence today. We did our part. We bore witness to the pain and hatred in this city. We provided pastoral care/support as needed, especially during traumatic violent acts. This was our determined role going into today. Yes, some clergy risked injury and arrest to stop the Nazis. They formed a blockade at the entrance, but they were overpowered by the Nazis. The police did not view us as threatening enough to shut things down, because again, we were not there to threaten.

"The antifa strategically incited enough violence before noon to make the police declare it illegal to gather in Emancipation Park. Through this strategic violence they effectively made a previously legally permitted Nazi rally, illegal.

"We may not agree with each others tactics. We may have had different goals, but if you're looking to praise people specifically for shutting down the "Unite the Right" rally, praise/thank the antifa. Not the clergy and not the police."

*Exhibit 5, pp. 16-18*

27. As of this writing, the above words can still be found posted on the internet at https://crimethinc.com/2017/08/17/why-we-fought-in-charlottesville-a-letter-from-an-anti-fascist-on-the-dangers-ahead.  The link appears to be an anarchist website with a history of promoting political violence, and which features a picture of anarchists geared up to riot, as they did in Charlottesville.

28. Turning to the instant Subpoenae, I note that my attorney interposed objections on June 12, 2020.  *Exhibit 7, Peinovich Objections dated June 12, 2020.*

29. Cooley, LLP responded with a Letter on June 15, 2020.  *Exhibit 8, Cooley, LLP Letter dated June 15, 2020.*

30. My attorney countered with a further letter dated June 22, 2020.  *Exhibit 9, Peinovich*

*Response dated June 22, 2020.* Said Letter specifically sought a good faith basis for the demands herein: "If you have a good faith basis for your demands, please set it forth. None is apparent in light of your client's admissions to Mr. Heaphy & Co., or your own legal stance of May 14, 2018." *Id at p. 6*

31. Cooley, LLP thereafter failed to respond to this demand.

32. Upon information and belief, my attorney reached out to Cooley, LLP and conducted what is known as a "meet and confer" on Friday, June 26, 2020. It resulted in no compromise.

33. Furthermore, it appears that Plaintiffs had earlier served a subpoena on David Duke, which resulted in a decision at *Sines v Kessler*, 325 FRD 563 (ED LA, 2018). It appears that several of the demands struck by the court there are similar to those served against me. *Cf. Exhibit 10, Subpoena Demands to David Duke and Sines v Kessler at 569, with Exhibit 1 herein*.

34. For almost six years now, I have done almost ten hours per week of publicly available podcasts on my show, currently called "The Right Stuff." Parsing through hundreds of hours of audio to attempt to respond to the fishing expedition here would be an incredible undue burden, especially where Plaintiffs can and should do so themselves. (My podcasts, totaling hundreds of hours, are available on-line.)

35. Furthermore, how or why the internal workings of "the Right Stuff" or any other show formerly done by me, such as "The Daily Shoah,"would be even remotely relevant to the allegations of the Second Amended Complaint are never stated by Plaintiffs, and they simply are not relevant.

36. Finally, I note that this lawsuit and the discovery herein has a chilling effect on the rights

of speech and related rights of association. In times past, the courts have been sensitive to the chilling that revealing names of the NAACP had on that organization. e.g. *NAACP v. Alabama*, 357 US 449 (1957) and *Bates v. Little Rock*, 361 US 516 (1960). Today, the danger comes from "doxxing" those on the dissident right. e.g. "How 'Doxxing' Became a Mainstream Tool in the Culture Wars":

https://www.nytimes.com/2017/08/30/technology/doxxing-protests.html.

/s/ Michael Peinovich
Michael Peinovich

Sworn to before me the
29th day of June, 2020

/s/ Frederick C. Kelly
 Notary Public

Qualified in Orange County
No. 02KE6146314
Commission Expires May 15, 2022